UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ERIC B. TRACY,

                              Plaintiff,

             -against-                                  5:15-cv-1085 (LEK)

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                              Defendant.

_____

## DECISION and ORDER

## I.     INTRODUCTION

       This case has proceeded in accordance with General Order 18, which sets forth the

procedures to be followed in appealing a denial of Social Security benefits.  Both parties have filed

briefs.  Dkt. Nos. 13 ("Plaintiff's Brief"); 15 ("Defendant's Brief").  For the following reasons, the

judgment of the Social Security Administration ("SSA") is affirmed.

## II.    BACKGROUND

       On December 14, 2011, Plaintiff Eric B. Tracy ("Plaintiff") filed for Supplemental Social

Security Income benefits, alleging disability with an onset date of October 19, 2010.  See Dkt. No. 9

("Record") at 164.[1]  The application was denied on March 9, 2012.  R. at 74.  On April 4, 2012,

Plaintiff requested a hearing with an administrative law judge ("ALJ").  The hearing occurred on

January 10, 2014 via video teleconference, before ALJ Roxanne Fuller, who presided over the

hearing in Falls Church, Virginia.  R. at 30, 86.  Plaintiff was represented at the hearing by a non-

attorney representative.  R. 73.

_____

       [1] Citations to the Record use the pagination assigned by the SSA.

ALJ Fuller determined that Plaintiff was not disabled under the meaning of the Social Security Act in a decision dated May 9, 2014. R. at 13. The Social Security Appeals Council denied Plaintiff's request for review on July 8, 2015. R. at 1-5. Plaintiff timely filed an appeal on September 4, 2015. Dkt. No. 1 ("Complaint").

**A. Plaintiff's Medical Records and History**

Plaintiff is a thirty-nine year old male who complains of chronic back pain, carpal tunnel syndrome, abdominal pain, degenerative disc disease, glaucoma, depression, bipolar disorder, and bad knees and ankles. R. at 34. Plaintiff has a tenth-grade education and resides with his grandmother. R. at 374. Plaintiff's work history is sporadic and extensive; the record shows that he had at least 29 jobs from 1992 to 2012, most of which consisted of restaurant work or landscaping. R. at 169-84. Plaintiff estimated that he was last employed in approximately 2010. R. at 41. Plaintiff has a history of drug use and dependency, although he stated that marijuana is the only illegal drug that he was using at the time of the ALJ hearing. R. at 36, 451.

Dr. Robert Feldman at North Medical has been Plaintiff's primary care physician since March 2010. R. at 348. Medical records from Plaintiff's visits with Dr. Feldman indicated ongoing back pain. R. at 302-48. On March 3, 2011, the office visit record stated that while Plaintiff was not a surgical candidate, his 2008 MRI showed multiple bulging discs. R. at 330. Three months later, Plaintiff visited Dr. Feldman to discuss the possibility of aqua therapy for pain relief, and it was noted that Plaintiff "would like his job coaches to see he is in therapy." R. at 318. On August 17, 2011, Plaintiff complained of pain in his back registering five out of ten and was given Cymbalta and Tramadol for pain relief. R. at 311, 313. Dr. Feldman noted during an office visit on September 14, 2011, that Plaintiff's pain was controlled with medication. R. at 308. Plaintiff did

state, however, that he was waking up with pain at night.  Id.  Dr. Feldman also noted that Plaintiff complained of not having motivation or energy to do daily activities, but that Plaintiff denied being depressed.  Id.

Dr. Feldman submitted a residual functional capacity ("RFC") assessment evaluating Plaintiff's ability to do work-related activities on May 3, 2012.  R. at 416-19.  Dr. Feldman assessed that Plaintiff was able to occasionally lift and carry up to twenty pounds, sit for a total of five hours out of an eight-hour workday, and stand and walk for a total of three hours in an eight-hour workday.  R. at 416-17.  Dr. Feldman stated that Plaintiff had the ability to frequently use his hands for simple grasping and fine manipulation and that Plaintiff could occasionally climb, balance, stoop, crouch, kneel, and crawl.  R. at 417.  The only environmental restrictions he suggested were in relation to humidity and temperature extremes, which exacerbated Plaintiff's pain.  R. at 418. Despite his pain, Dr. Feldman noted that Plaintiff was still able to garden and go fishing at times.  R. at 419.

Prior to switching to Dr. Feldman in 2010, Plaintiff had been seeing Nurse Practitioner Jolene Cook ("NP Cook") at Family Care Medical Group.  R. at 256-91.  Although the earliest records from NP Cook are dated May 5, 2004, the records indicate that Plaintiff had been a patient for some time prior to that date.  R. at 291.  Records from Family Care are consistent with Plaintiff's history of back pain and depression.  Id.  On February 22, 2007, Plaintiff saw NP Cook for a follow up after a thoracic x-ray, the results of which were negative for any compression fractures.  R. at 278, 287.  NP Cook noted that although Plaintiff had mild tenderness bilaterally at the spinous process, he exhibited a full range of motion with no pain.  R. at 278.

The cause of Plaintiff's intermittent abdominal pain has remained unknown.  Dr. Feldman

noted that an abdominal CT done on March 25, 2011, found a large amount of stool compatible with constipation and a 4 mm left lower lobe pulmonary nodule, but was otherwise normal. R. at 371. A year later, on March 25, 2012, an emergency room visit for abdominal pain resulted in no noteworthy findings, and Plaintiff was instructed to follow up with Dr. Feldman. R. at 410. Plaintiff later stated to consultative examiner Dr. Ganesh that he was told of "possible sludge in the gallbladder," although there is nothing in the record that supports his statement. R. at 379.

New York Spine and Wellness Center ("NYSWC") has regularly treated Plaintiff for his back and neck pain. Plaintiff has described his back pain as being "sharp" and "shooting" and has suffered from back pain for at least 20 years, although he was unable to recall any specific event which would have caused its onset. R. at 34, 450. His medical records from NYSWC consistently describe a normal gait, full range of motion in his spine, and a pleasant and appropriate mood and affect. R. at 442, 445-46, 448, 452. Plaintiff did have one visit at NYSWC where he exhibited an agitated and angry mood and affect after being told that he would not be prescribed any narcotics while he continued to smoke marijuana. R. at 436-37. Plaintiff received a facet joint medial branch nerve block at the L5-S1 level on December 12, 2012. R. at 454. At a follow-up visit Plaintiff stated the nerve block made his back pain worse, although his leg pain did get better. R. at 441. Plaintiff had an MRI of his spine on July 2, 2013, which showed minor central disc herniation/protrusion with no significant central canal or lateral recess narrowing at L5-S1, very minor disc bulging at L4-L5 with no disc herniation, and mild degenerative changes to the facet joints. R. at 486.

Dr. Walter Short at Syracuse Orthopedic Specialists has been treating Plaintiff for his carpal tunnel syndrome. R. at 483. Plaintiff has complained of numbness, tingling, and weakness in his

4

wrists and hands. Id. An examination on July 16, 2013, revealed a mildly positive Phalen's sign and a negative Tinel's sign. R. at 484. Plaintiff was given bilateral wrist braces as treatment. Id.

Randall Stetson, LCSW-R, has been treating Plaintiff since 2007 and has diagnosed Plaintiff with Bipolar 1, MRE Unspecified. R. at 384. There are no treatment records from Mr. Stetson, but he did submit a Medical Source Statement on April 4, 2012. R. at 45, 384-87. In evaluating Plaintiff's impairments to working, he stated that Plaintiff had mild impairments in (1) understanding and remembering simple instructions, (2) carrying out simple instructions, and (3) the ability to make judgments on simple work-related decisions.[2] R. at 385. Mr. Stetson found that Plaintiff exhibited marked impairments in his ability to (1) understand and remember complex instructions, (2) carry out complex instructions, and (3) make judgments on complex work-related decisions.[3] Id. When evaluating Plaintiff's ability to interact with others, Mr. Stetson noted a mild impairment in Plaintiff's ability to interact appropriately with the public, and moderate limitations in interacting appropriately with supervisors and coworkers.[4] R. at 386. He also mentioned a moderate impairment in Plaintiff's ability to respond appropriately to usual work situations and to changes in a routine work setting. Id.

Dr. E. Kamin is a state agency medical consultant who concluded that Plaintiff was "not disabled" on March 2, 2012. R. at 71. In a RFC assessment included in the disability determination

---

[2] A mild limitation is defined as "a slight limitation in this area, but the individual can generally function well." R. at 385.

[3] A marked limitation is defined as "serious limitation in this area. There is substantial loss in the ability to effectively function." R. at 385.

[4] A moderate limitation is defined as "more than a slight limitation in this area but the individual is still able to function satisfactorily." R. at 385.

explanation, he stated that while Plaintiff's impairments could be expected to produce Plaintiff's pain or other symptoms, Plaintiff's statements about the intensity, persistence, and functionally limiting effects of the symptoms were not substantiated by the objective medical evidence.  R. at 67.  Specifically, Dr. Kamin noted that while Plaintiff claimed to be unable to stand or walk for extended periods of time, he went shopping, traveled, walked, and did chores.  Id.  The report stated that Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting.  R. at 69.

Dr. Ganesh, an internal medicine consultative examiner, opined in 2012 that Plaintiff "appeared to be in no acute distress.  Gait normal. . . . Stance normal.  Used no assistive devices.  Needed no help changing for exam or getting on and off exam table.  Able to rise from chair without difficulty."  R. at 380.  Plaintiff's cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally.  R. at 381.  Plaintiff's lumbar spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally.  Id.  Dr. Ganesh found no gross physical limitation to sitting, standing, walking, or the use of upper extremities and only mild limitation lifting, carrying, pushing, and pulling.  Id.

On December 19, 2013, treating source Zoryana Moreau, RNP, ("RNP Moreau") submitted an assessment of Plaintiff's ability to do work-related activities.  R. at 477-80.  The assessment stated that Plaintiff had the ability to frequently lift and carry up to ten pounds and occasionally lift and carry up to twenty pounds.  R. at 477.  Because of his carpal tunnel syndrome, Plaintiff could occasionally use both hands for grasping and fine manipulation.  R. at 478.  RNP Moreau stated that Plaintiff was capable of sitting, standing, and walking for zero hours each at one time without interruption and could occasionally balance, stoop, crouch, kneel, and crawl.  Id.  She also noted

that Plaintiff should avoid concentrated exposure to heights, moving machinery, chemicals, noise, humidity, dust, temperature extremes, fumes, vibrations, and "other." R. at 479. Lastly, RNP Moreau wrote that Plaintiff required frequent breaks due to pain. R. at 480.

In February of 2012, Christina Caldwell, Psy.D., performed a consultative psychiatric exam on Plaintiff. R. at 374. When Dr. Caldwell assessed Plaintiff's psychiatric history, she noted that Plaintiff had no prior hospitalizations but had been in and out of counseling since he was a child. Id. According to Dr. Caldwell's evaluation, Plaintiff's depression began as a result of his back pain and a childhood experience of sexual abuse by an uncle and a teacher. R. at 374-75. Plaintiff reported "dysphoric mood, psychomotor retardation, crying spells, loss of usual interests, social withdrawal, diminished sense of pleasure, diminished self-esteem, fatigue, and loss of energy." R. at 375. When discussing his marijuana usage, Plaintiff repeatedly stated, "If I lived in California, it would be prescribed to me." Id. During the examination, Plaintiff's demeanor and responsiveness to questions was cooperative, his manner of relating, social skills, and overall presentation was adequate, his intelligibility was fluent, his thought processes were coherent and goal directed, and his gait, posture, and motor behavior were normal. Id. Plaintiff's attention and concentration were intact, as were his recent and remote memory skills. R. at 376. Despite noting that Plaintiff's judgment was "fair," Dr. Caldwell also stated that he is limited in "his ability to make appropriate decisions" and "his ability to appropriately deal with stress." Id. Dr. Caldwell stated that

> [Plaintiff] is able to follow and understand simple directions and instructions, able to perform simple tasks independently, able to maintain attention and concentration, maintain a regular schedule, and learn new tasks. He is limited in his ability to make appropriate decisions. He is able to relate adequately with others. He is limited in his ability to appropriately deal with stress.

7

R. at 376.

**B. ALJ Hearing**

Plaintiff's ALJ hearing occurred on January 10, 2014.  R. at 30.  During the hearing, Plaintiff testified to the disabilities of carpal tunnel, disc problems in his back and upper neck, glaucoma, bad knees and ankles, and depression.  R. at 34, 36.  As to his back pain, Plaintiff states that his pain is sharp and shooting, and is constant "[s]ometimes.  It comes and goes."  Id.  Without medication, he testified that his pain is a ten, but with his prescribed Tylenol with codeine, the pain is a three or four.  R. at 35.  Despite the utility of the Tylenol with codeine in managing his pain, Plaintiff testified that he does not take it every day.  R. at 52.

Plaintiff reported that his pain management for his degenerative disc disease includes the Tylenol with codeine, his back brace, and stretches.  R. at 51.  He stated that doctors told him that his surgical option for more permanent relief was removing his entire spine and putting a new one in.  Id.

Plaintiff's carpal tunnel syndrome has been treated by Dr. Short at Syracuse Orthopedic Specialists.  R. at 42-43.  The primary treatment has been hand braces.  R. at 43.  Plaintiff stated that the braces have helped with maintaining his daily activities, but that "trying to work a regular job, I can't do it."  Id.  He has attempted to work at Valvoline, End Therm, and Capria's Restaurant.  R. at 44.  Plaintiff did not give any reasons related to his disabilities as to why he was unable to maintain work at Valvoline, but claimed that he had oil dumped on him and his coworkers punched him in the stomach.  Id.  At Capria's Restaurant and End Therm, repetitive activities with his hands made them numb to the point of immobility.  Id.  While the answers to the ALJ's questions on the subject

of these jobs related to the difficulty with continuous hand usage, Plaintiff insisted that it is mainly his back pain and depression which kept him from working. Id.

When discussing his glaucoma, Plaintiff reported that it is worse in his left eye, and he has difficulty seeing bright lights or screens. R. at 50. He did state that he is still able to read. Id.

Plaintiff told the ALJ that his last job was about four years ago, working at the State Fair. R. at 41. When he worked at the State Fair, he was required to lift about 50 pounds at a time. Id. Other previous employment of the Plaintiff included Burger King and Embassy Suites. Id. Plaintiff emphasized that he is unable to do work similar to what he did before because of his carpal tunnel syndrome, back pain, and numerous doctor's appointments. Id.

Plaintiff has also had many problems working with people. R. at 53. He stated that he has been bullied all his life, and that he has had problems with people at every job that he has had. Id. He testified to having one friend, who was recently diagnosed with a brain tumor. Id. Other than occasionally seeing that one friend and going out with family members, Plaintiff stated that he is happy staying at home because he does not like today's society. R. at 54.

Plaintiff stated that he has been in counseling since the age of five for depression. R. at 44-45. At the time of the ALJ hearing, Plaintiff was seeing Mr. Stetson once every two weeks for counseling. R. at 45-46. He does not take any medication for his depression, reporting that previous experiences with medication made him suicidal. R. at 46. Plaintiff claimed that his symptoms of depression include being unable to get out of bed at times, a lack of appetite, and problems multitasking and focusing. R. at 36, 47. In regard to his troubles with multitasking, he testified that at his old jobs, "people [would] try to give [him] 100 things to do," which made it difficult for him to focus. R. at 47.

Despite Plaintiff's numerous disabilities, during the oral hearing he indicated that there were many things that he was still able to do. Plaintiff resided with his grandmother, and reported taking care of her by helping her into the bathroom and up the stairs. R. at 48. He stated that he did not have any problems taking care of the house and that he could focus on "the little things" that he has to do. R. at 49. Plaintiff cooks, cleans, does his own yard work, and even makes the two mile trip to the grocery store on his scooter. R. at 38, 48-49. Plaintiff bathes and dresses himself so long as his depression does not keep him in bed. R. at 38. He also has two cats, a bird, a dog, and three goldfish that he cares for. R. at 54.

The oral hearing also included testimony by vocational expert ("VE") Linda Ebersole. R. at 54. VE Ebersole heard the testimony of Plaintiff, and was also given specific parameters by the ALJ in determining what work Plaintiff may still be able to do. R. at 56. The ALJ instructed the VE to assume

> an individual of the same age, education, and work experience as the claimant, and this individual would be able to perform light work as defined by the regulations. Occasional climb ramp or stairs, occasional climb ladders, ropes or scaffolds. Occasional balance, stoop, crouch, kneel, [and] crawl. Frequent handling objects, that is, gross manipulation with both hands. Frequent fingering, that is, fine manipulation of items no smaller than the size of a paperclip with both hands. Frequent feeling with both hands. Occasional exposure to wetness. Limited to occupations requiring only occasional far acuity. Able to remember and carry out four to five step instructions. Able to perform simple, routine, and repetitive tasks. Have only occasional superficial interaction with public, co-workers and supervisors.

Id. Based on those stipulations, the VE determined that Plaintiff would be able to perform the jobs of table worker, routing clerk, and mail sorter. R. at 56-57. The ALJ further restricted instructions to jobs with the same stipulations but sedentary level of exertion, and the VE testified that Plaintiff

would be able to perform the jobs of lens inserter, addresser, and surveillance system monitor. R. at

57. If the individual was limited to occasional gross manipulation and occasional fine manipulation

with both hands, Plaintiff would still be able to perform the work of a mail sorter, routing clerk,

table worker, and surveillance system monitor. R. at 57-58. The VE did state that if the individual

were to be off task for twenty percent of the day or if he were absent four times a month, the

individual would not be able to maintain any of the positions. R. at 58.

### C. The ALJ's Decision

In an opinion dated May 9, 2014, ALJ Fuller denied Plaintiff's claim. R. at 13-25. At step

one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since

December 14, 2011, the date of the application for benefits. R. at 15. At steps two and three, the

ALJ found that Plaintiff had the severe impairments of degenerative disc disease, carpal tunnel

syndrome, glaucoma, depression, and marijuana abuse, and the non-severe medically determinable

impairments of a cyst on his right buttocks and abdominal pain. Id. Although the non-severe

impairments were supported by the medical record, there was no indication that they affected

Plaintiff's ability to work. Id. The ALJ found that Plaintiff's knee, ankle, and other joint pain were

not medically determinable impairments, as they were based solely upon Plaintiff's subjective

allegations and lacked any medical evidence. Id. The ALJ determined that none of the impairments

singularly or in the aggregate meets or medically equals the severity required for an impairment

under 20 C.F.R. Part 404, Subpart P, Appendix 1. Id.

In evaluating the severity of Plaintiff's depression, the ALJ considered (1) activities of daily

living; (2) social functioning; (3) concentration, persistence, or pace; and (4) decompensation. R. at

16-17. The ALJ found mild restriction in activities of daily living and noted that while Plaintiff

asserted difficulty in his daily activities, the evidence indicated otherwise. R. at 16. The ALJ

pointed to numerous daily activities that Plaintiff testified to being able to do during the oral

hearing, including preparing meals, doing housework, mainting most aspects of personal care,

driving a car, riding a bike, managing his finances, and caring for his grandmother and pets. Id.

Based on Plaintiff's daily activities, the ALJ concluded that he had only mild restrictions in

activities of daily living. Id. As to social functioning, the ALJ determined that Plaintiff had only

moderate difficulties, as he was able to leave the house, go to the grocery store, and talk to others on

the phone. Id. When evaluating concentration, persistence, and pace, the ALJ once again noted

Plaintiff's ability to do numerous daily activities related to personal care and hygiene, and care of

his pets and grandmother. Id. Because of Plaintiff's limited difficulties in doing tasks in the home,

the ALJ determined that Plaintiff had only moderate restrictions in maintaining concentration,

persistence, and pace. R. at 17. Lastly, the ALJ noted that Plaintiff had not experienced any

episodes of decompensation lasting for an extended duration. Id.

Before step four, the ALJ determined that Plaintiff has the RFC to perform light work,

> [E]xcept he can occasionally balance, stoop, crouch, kneel, crawl, and
> climb ramps, stairs, ladders, ropes, and scaffolds; frequently handle
> objects (gross manipulation) with both hands; frequently finger (fine
> manipulation) of items no smaller than the size of a paper clip with both
> hands; frequently feel with both hands; tolerate occasional exposure to
> wetness; maintain work requiring only occasional far acuity; remember
> and carry out four to five-step instructions; perform simple, routine,
> repetitive tasks; and have only occasional, superficial interaction with
> the public, coworkers, and supervisors.

R. at 17-18. The ALJ decided at step four that Plaintiff was unable to perform any past relevant

work. R. at 23. At the last step, the ALJ found that based upon Plaintiff's age, education, work

experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff could perform.  R. at 24.

In reaching her conclusions regarding Plaintiff's RFC, the ALJ relied on numerous medical opinions from both treating and non-treating sources.  Treating source Dr. Feldman's assessment was granted "some weight," as the ALJ found his findings of a light range of work with occasional postural activities and frequent fine and gross manipulation are consistent with other findings in the record and the RFC finding.  R. at 22.  However, the ALJ found that Dr. Feldman's assessment as to restrictions in sitting for no more than two hours at a time and a total of five hours in a day, standing for no more than two hours at a time and no more than three hours total in an eight-hour workday, and limited reaching were unsupported and contradicted by Plaintiff's demonstration of a consistently intact gait, strength, and range of motion throughout the record.  Id.

The opinion of treating source FNP Moreau was granted "little weight" by the ALJ.  Id.  In choosing to give FNP Moreau's opinion little weight, the ALJ noted that the findings, if not made in error, were in direct contradiction to the other medical evidence in the record.  Id.  Plaintiff has exhibited a normal gait and intact strength and range of motion during FNP Moreau's own examinations and other examinations in the record.  Id.  Additionally, the ALJ noted that the Plaintiff's testimony regarding his daily living activities indicates an ability to perform a range of light work.  Id.  Lastly, the ALJ noted that Ms. Moreau is not an acceptable medical source.  R. at 23 (citing 20 C.F.R. § 416.913(a)).

The ALJ gave "great weight" to the opinion of Mr. Randall Stetson.  R. at 23.  The ALJ found Mr. Stetson's evaluation to be consistent with the RFC finding and with Plaintiff's general demonstration of good mental functioning.  Id.

The non-treating sources considered by the ALJ were Dr. Ganesh, Dr. Caldwell, and Dr. Kamin.  R. at 21-23.  In evaluating the findings of Dr. Ganesh, the ALJ stated that Plaintiff's "demonstrations were so benign that it is unclear why Dr. Ganesh found even mild limitations."  R. at 21.  Because Dr. Ganesh's findings were consistent with Plaintiff's demonstrations of intact gait, strength, and range of motion throughout the record, the ALJ gave great weight to Dr. Ganesh's opinion.  Id.

The ALJ granted "some weight" to the opinion of the state agency medical consultant, Dr. Kamin.  The ALJ found Dr. Kamin's opinion to be consistent with the RFC limiting Plaintiff to occasional social contact and unskilled work.  R. at 23.  Dr. Kamin's opinion was only granted some weight because he did not explain his finding of moderate restriction in ability to respond to changes in terms of Plaintiff's ability to function in a work setting.  Id.

Only certain parts of Dr. Caldwell's psychiatric assessment were granted great weight.  The ALJ granted great weight to Dr. Caldwell's finding that Plaintiff could still do unskilled work and found this finding to be supported by evidence in the record and in the rest of Dr. Caldwell's examination.  Id.  However, the ALJ granted little weight to Dr. Caldwell's findings of limitations in Plaintiff's ability to make decisions, relate with others, and deal with stress.  R. at 23.  In scrutinizing these findings, the ALJ noted that not only were they vague, but they were inconsistent with other findings during Dr. Caldwell's examination and the record as a whole.  Id.  In particular, the ALJ mentions findings throughout the medical record of intact socialization, cognition, orientation, thought, insight, and judgment.  Id.

Based upon the medical evidence and testimony in the record, the ALJ determined that while Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms

14

that he alleges, the objective evidence indicates that his impairments are not as limiting as he claims. R. at 18, 23. The ALJ stated that the objective medical evidence and the Plaintiff's own testimony about his daily activities contradict his allegations of physical impairments to his ability to work. Id.

## III.   STANDARD OF REVIEW

District courts may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g)). District courts may not undertake de novo review as to whether the Plaintiff is disabled. Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Reversal of the Commissioner's determination will only occur if the ALJ applied incorrect legal standards or if the determination is not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987). The "substantial evidence" standard refers to "evidence that amounts to 'more than a mere scintilla,' and it has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Zenzel v. Astrue, 993 F. Supp. 2d 146, 150 (N.D.N.Y. 2012) (Kahn, J.) (quoting Richardson v. Perales, 204 U.S. 389, 401 (1971)). Where substantial evidence is present to support the Commissioner's finding, that finding is given considerable deference and must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).

Disability is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To determine whether an individual is disabled, the SSA has established a five-step sequential evaluation process. See id. § 404.1520. The first step involves inquiring whether the claimant is engaged in substantial gainful activity. Id. § 404.1520(a)(4)(i). The second step evaluates the medical severity of the claimant's impairments. Id. § 404.1520(a)(4)(ii). If the claimant does not have "a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, [the SSA] will find that [the claimant is] not disabled." Id. Step three considers the medical severity of the impairments to evaluate whether the impairment(s) meets or equals one of the listings in Appendix I to subpart P of part 404. Id. § 404.1520(a)(4)(iii). At step four, an assessment of the claimant's residual functional capacity and past relevant work occurs to determine whether the claimant can still do past relevant work, and, if so, the claimant will not be found to be disabled. Id. § 404.1520(a)(4)(iv). At the last step, the burden shifts to the Commissioner to evaluate, based upon the claimant's residual functional capacity and age, education, and work experience, whether the claimant is able to do other work, and, if so, the claimant will not be deemed disabled. Id. § 404.1520(a)(4)(v).

## IV.     DISCUSSION

On appeal, Plaintiff argues that the ALJ's RFC finding was not supported by substantial evidence and is the product of legal error because (1) the ALJ failed to develop the record in regards to Dr. Caldwell's evaluation of Plaintiff's mental limitations; and (2) the ALJ failed to reconcile the RFC finding with Mr. Stetson's evaluation, to which the ALJ gave great weight. Pl.'s Br. at 8-14.

**A. Dr. Caldwell's Evaluation**

The ALJ gave great weight to only a portion of Dr. Caldwell's mental assessment of Plaintiff because the ALJ determined other parts of the assessment to be contradictory. R. at 23. In particular, Dr. Caldwell's statements of Plaintiff's limitations in making decisions, relating to others, and dealing with stress were deemed to be not only vague, but inconsistent with Dr. Caldwell's additional findings of intact judgment, socialization, and cognition. Id. The ALJ had also determined that the limitations expressed did not specify the degree of limitation or the most that Plaintiff would be able to do in a work setting. Id.

Plaintiff alleges that the ALJ failed to perform her duty to develop the administrative record by (1) failing to ask the VE about limitations expressed by Dr. Caldwell that were determined to be vague and inconsistent by the ALJ; and (2) failing to re-contact Dr. Caldwell. Pl.'s Br. at 10-11.

Due to the non-adversarial nature of Social Security benefit proceedings, the ALJ has an affirmative duty to develop the record, notwithstanding a claimant's representation by counsel. Shaw, 221 F.3d at 131. In developing the record, the ALJ is empowered to seek information from a claimant's treating physician or other medical source, request additional records, order consultative exams from other medical professionals, or ask a plaintiff for more information. 20 C.F.R. § 416.920b(c)(1)-(4). The duty to develop the record does not extend to seeking additional information unless "obvious gaps" hinder the making of an informed decision. Chambers v. Comm'r of Soc. Sec., No. 14-CV-0190, 2015 WL 6157434, at *6 (N.D.N.Y. Oct. 20, 2015) (citing Rosa v. Callahan, 168 F.3d 72, 29 n.5 (2d Cir. 1999)).

The ALJ's duty to develop the record does not extend to re-contacting non-treating sources. "The ALJ has a duty, *sua sponte*, to develop the record and seek additional information from the

treating physicians." Stytzer v. Astrue, No. 07-CV-0811, 2010 WL 3907771, at *7 (N.D.N.Y. Sept. 30, 2010); See also SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996) ("For *treating sources*, the rules also require that [the Commissioner] make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us." (emphasis added)).  Dr. Caldwell was not a treating source, but merely gave a one-time consultative examination at the request of the Commissioner.  R. at 377. There is no case or statutory precedent that requires an ALJ to re-contact a non-treating source.  See Gruka v. Colvin, No. 14-CV-795s, 2015 WL 9478242, at *5 (W.D.N.Y. Dec. 26, 2015) (holding that no duty exists to re-contact non-treating sources).

Additionally, it is the duty of the ALJ to weigh the medical evidence and determine a claimant's disability status based upon all of the evidence as a whole.  20 C.F.R. § 416.927(e)(2)(i). The same source that Plaintiff cites in support of her contention that Dr. Caldwell possessed the requisite skill to create an internally consistent medical source statement also explicitly states that "[ALJs] are not bound by any findings made by State agency medical or psychological consultants . . . ."  Id.  When an ALJ evaluates the findings made by a non-treating consultative examiner, he or she considers factors such as "the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions." Id. § 416.927(e)(2)(ii).  Here, the ALJ stated her reasons for giving little weight to a portion of Dr. Caldwell's opinion, as the ALJ determined that there were internal inconsistencies with Dr. Caldwell's evaluation, and the evaluation was inconsistent with the record as a whole.  R. at 23.

Plaintiff contends that Dr. Caldwell's evaluation was not inconsistent, and therefore should have been given greater weight. Pl.'s Br. at 11. However, in making this proposition, Plaintiff ignores the ALJ's determination that the evaluation was not only inconsistent within itself, but also inconsistent with the record as a whole. R. at 23. Dr. Caldwell stated in her evaluation that Plaintiff was limited in his ability to make appropriate decisions, relate adequately with others, and appropriately deal with stress. R. at 376. In the same evaluation, Dr. Caldwell claimed that Plaintiff possessed fair judgment, was cooperative and responsive to questions, and that his manner of relating, social skills, and overall presentation were adequate. R. at 375-76. Mr. Stetson stated that Plaintiff was only mildly limited in his ability to make judgments on simple work-related decisions. R. at 385. Plaintiff's treating physicians at NYSWC consistently documented that Plaintiff's judgment remained intact, his insight was normal, and that during all visits except for one, he exhibited a pleasant mood and affect. R. at 436-37, 442-43, 445-46, 448, 452.

Had Dr. Caldwell's testimony been properly credited, Plaintiff argues that the VE testimony would reduce the market for other jobs. Pl.'s Br. at 12. VE testimony is admissible at step five to establish that jobs exist in sufficient numbers in the national economy that a person with Plaintiff's mental or physical abilities would be able to perform. Dumas v. Schweiker, 712 F.2d 1545, 1553-54 (2d Cir. 1983); 20 C.F.R. § 404.1566(b). "If the factors set forth in the hypothetical are supported by substantial evidence, then the vocational expert's testimony may be relied upon by the ALJ in support of a finding of no disability." Magee v. Astrue, No. 05-CV-413, 2008 WL 4186336, at *20 (N.D.N.Y. Sept. 9, 2008).

The hypothetical posed to the VE considered an individual who could remember and carry out four-to five-step instructions; perform simple, routine, repetitive tasks; and have only superficial

interaction with the public, supervisors, and co-workers. R. at 56. The Court finds that the

hypothetical posed to the VE was supported by substantial evidence. Additionally, while the ALJ

gave only little weight to Dr. Caldwell's opinion, the hypothetical was not contradictory to it. Dr.

Caldwell's assessment of Plaintiff's recent and remote memory skills indicated that Plaintiff could

remember five digits forward and four digits backwards, which is consistent with the ALJ's

assessment of Plaintiff's ability to remember and carry out four-to five-step instructions. R. at 56,

376. The ALJ's limitation of work to simple, routine, and repetitive tasks ensures that Plaintiff will

not be required to perform complex tasks independently, use discretion in making workplace

decisions, or be placed in an unreasonably stressful situation. R. at 376. By limiting Plaintiff to

only occasional, superficial interaction with others, the RFC is consistent with Dr. Caldwell's

statement that Plaintiff is limited in his ability to relate adequately to others. Id. Despite the ALJ

giving only little weight to portions of Dr. Caldwell's assessment, the mental RFC was not wholly

incompatible with her assessment, and it was consistent with other evidence from treating sources.

Accordingly, there was no error by the ALJ in regards to Dr. Caldwell's assessment or the RFC.

**B. The RFC and Mr. Stetson's Assessment**

Plaintiff posits that the RFC is irreconcilable with Mr. Stetson's assessment, to which the

ALJ gave great weight. Pl.'s Br. at 13. Plaintiff states that an RFC limiting Plaintiff to simple,

repetitive, and routine tasks involving no more than four-to five-step instructions is inconsistent

with Mr. Stetson's findings that Plaintiff is markedly limited in his ability to (1) understand and

remember complex instructions, (2) carry out complex instructions, and (3) make judgments on

complex work-related decisions. Id. The Court disagrees.

Mr. Stetson opined that Plaintiff was only slightly limited in his ability to understand and

remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions, and that Plaintiff could "generally function well." R. at 385. The limitation of the RFC to only simple, repetitive, and routine tasks is wholly consistent with Mr. Stetson's evaluation. R. at 18, 385. Therefore, the RFC was supported by substantial evidence and the Court must affirm the ALJ's determination that Plaintiff is not disabled.

## V.  CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the decision of the Commissioner is **AFFIRMED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

DATED:        June 23, 2016
                     Albany, New York


_____
Lawrence E. Kahn
U.S. District Judge


21